Filed 2/6/15  Siechert & Synn v. Apple, Inc. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SIECHERT & SYNN et al., | H036402 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. 1-05-CV-045719) |
| v. | |
| APPLE INC., | |
| Defendant and Respondent. | |

Plaintiffs Siechert & Synn dba Techsource, Joe Weingarten dba Weingarten Gallery, Pamela Rogers dba Horizon Resources and Horizon Computer Resources, Omnitech Computer, and Computer Outlet appeal from the denial of their motion to certify a class of "Apple Authorized Specialists" in their action against defendant Apple Inc.  Plaintiffs were formerly engaged in the business of selling Apple computers and other Apple products.  They sued Apple, alleging that the company's decision to open its own retail stores was part of a "fraudulent scheme and plan" to drive its independent resellers out of business.  Plaintiffs asserted that Apple concealed this scheme and induced them to continue doing business with the company by assuring them that its own stores would operate on a "level playing field" with theirs.  They alleged among other things that Apple favored its own stores to plaintiffs' detriment by "deliberately" withholding new products from resellers while making those products "readily available"

to its own stores and by "siphoning off" the resellers' customers. Plaintiffs also alleged that Apple gave "'secret rebates'" to favored resellers such as CompUSA and Fry's but not to Specialists.

The trial court's denial of plaintiffs' class certification motion was based on findings that they failed to show that common questions predominated over individual issues or that a class action would be superior to individual lawsuits. We affirm the order.

## I. Background

Historically, Apple sold its products to consumers mainly through independent resellers. These included large national chains like CompUSA, regional chains like Fry's, and smaller establishments like those of the plaintiff Specialists.

Specialists are a subset of the larger group of Apple's authorized resellers. They are so named because they specialize in the sale and service of Apple computers. Specialists sign annual Specialist confirmation letters in addition to the authorized reseller agreements that all Apple resellers sign.

Specialists comprise a diverse group of small to medium-sized businesses pursuing various business plans and targeting different customers in markets across the country. Some Specialists focus on retail sales. Others serve business customers only. Some target specific industries like advertising or entertainment. Some Specialists have multiple stores while others have only a single storefront. Some have no storefront at all. Those with storefronts operate in a variety of different locations. Some are in high-traffic shopping malls or on prominent shopping streets, while others are in places that attract few to no casual browsers. Some Specialists' stores are just blocks away from an Apple store. Others are located in areas with multiple Apple stores. Others are hundreds of miles from the nearest Apple store. Some Specialists keep millions of dollars of product

in inventory. Others (like plaintiff Horizon) carry little or no inventory, preferring to purchase products when their customers place orders.

Apple's share of the United States personal computer market declined dramatically in the 1990's, even after the company started selling computers online in the late 1990's. In an effort to reverse the decline, Apple decided to supplement its reseller and online sales channels with its own retail stores. Its goal was to increase market share by convincing the 95 percent of United States consumers who did not already own Apple computers to buy them. The advertising slogan that proclaimed the May 2001 opening of the first Apple stores announced this goal: "'5 down. 95 to go.'"

Plaintiffs filed this action in February 2005 on behalf of two groups, a consumer group and a resellers' group. This appeal concerns the resellers' group.[1] Plaintiffs filed their Eighth Amended Complaint in February 2009. It broadly defined the reseller class to include "[a]ny Apple reseller in the United States who sold at retail Apple computer products, Apple service, AppleCare service contracts, and/or repair services directly or indirectly at any time between January 1, 1995, through the present . . . ." The complaint asserted eight causes of action on behalf of the reseller class: (1) breach of contract, (2) violation of the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200 et seq.),[2] (3) misappropriation of trade secrets, (4) fraud and deceit, (5) breach of the covenant of good faith and fair dealing, (6-7) violations of the Cartwright Act (later dismissed without prejudice), and (8) violation of the Unfair Practices Act (UPA; § 17000 et seq.).

The complaint alleged the following facts. In 1997, Apple began developing plans to open its own retail stores "with the specific intent" to drive its independent resellers out of business. Because there was a limit to the number of stores it could open each year

---

[1]     We decided the consumer group's separate appeal in the related case of *Branning et al. v. Apple Inc.* (H036343).

[2]     Subsequent statutory references are to the Business and Professions Code unless otherwise noted.

3

and because its resellers were an important source of income, Apple wanted to continue its relationship with its resellers until it could establish its own chain of stores. Apple knew its resellers would be concerned about the impact of the Apple stores on their own sales, so it "devised a fraudulent scheme and specific, uniform representations to be made to all [r]esellers" to induce them to continue doing business with Apple. The "series of false representations" or "mantra" that Apple allegedly developed included statements (1) that the purpose of the Apple stores was to increase the company's share of the computer market and not to take sales away from resellers; (2) that the stores would be "'showcase' stores" and have "a 'billboard effect'" that would increase resellers' sales; (3) that "'[a]ll ships will rise with the tide'" (meaning that resellers' sales would rise along with the retail stores' sales); and (4) that Apple would ensure "'a level playing field'" (meaning that it "would not give any special preferences to the Apple retail stores that would disadvantage the independent Resellers").

Plaintiffs alleged that Apple distributed a bulletin to resellers before the first Apple store opened in May 2001. It contained "specific assurances" that the Apple stores "would be stocked the same as other [r]esellers so as not to have any 'priority on product supply or delivery,' that they would not get demo units other than on the schedule of other [r]esellers, and that the Apple retail stores would not have better pricing from Apple than the pricing given by Apple to the [r]esellers." Plaintiffs alleged that Apple repeated these assurances in press releases and at store openings, in various meetings with resellers, at a 2004 conference, and at the company's 2005 annual meeting. The resellers reasonably relied on the representations, continued their relationships with the company, and continued to invest millions of dollars in their businesses to promote sales of Apple products. Plaintiffs (with the exception of Siechert & Synn, which dismissed its fraud cause of action) and the reseller class suffered "severe monetary damages" as a direct result of Apple's intentional misrepresentations and concealment.

4

Plaintiffs alleged that as part of its scheme to drive them out of business, Apple (1) located its retail stores in close proximity to successful resellers' stores "for the specific purpose of siphoning off" their customers; (2) intentionally failed to provide resellers with Apple merchandise, goods, and services and support for Apple products sold and/or serviced by the resellers; (3) deliberately withheld new products from resellers while making them available to the public through the Apple stores; (4) misrepresented to the resellers that new products were unavailable while providing them to the Apple retail and online stores; (5) "bypassed" resellers and used resellers' confidential customer information "to contact, solicit and deal directly with" resellers' customers and prospects; (6) failed to properly honor warranties sold by resellers; (7) "consistently failed to acknowledge and respond" to critical questions from the resellers; and (8) failed and refused to provide proper credits to resellers when credits were clearly due to them. Plaintiffs also alleged that Apple misrepresented the nature and quality of the equipment it sold to resellers, shipped defective replacement parts and/or equipment to them, and failed to appropriately reimburse them for warranty work. Plaintiffs alleged that they and the reseller class were "damaged in an amount to be proven . . . at trial, but in an amount in excess of $25,000.00."

The complaint alleged that Apple also engaged in unfair practices by (1) giving favored resellers like CompUSA and Fry's "secret discounts, allowances, rebates and development funds" not offered to other resellers; (2) selling service contracts to CompUSA at a substantial discount; (3) providing CompUSA with Apple-paid employees; (4) accepting defective products from Apple stores and from preferred resellers but not from other resellers; and (5) providing cooperative advertising allowances, sales promotions, and market development funds to Apple stores and to preferred resellers but not to other resellers. Plaintiffs alleged that these secret rebates gave the favored resellers a major pricing advantage that had the inherent tendency to

5

destroy competition and caused plaintiffs injury in an amount not yet ascertained but in excess of $25,000.

In November 2009, plaintiffs moved to certify a much narrower class than the all-resellers class their Eighth Amended Complaint defined. They defined this narrower class as "'[a]ll persons in the United States who were Apple Authorized Specialists on January 1, 2001, or became Specialists between that date and January 1, 2004.'" Plaintiffs' memorandum of points and authorities focused on Apple's alleged secret plot to put them out of business and on the "scripted misrepresentations" that it allegedly made to convince them to continue doing business with Apple until it could establish its own stores. Plaintiffs argued that "Apple's plan, its execution of that plan, its uniform omissions and misrepresentations to the class and the legal and factual effect of its conduct on the Specialists" could be proven with common evidence and that "[e]ven damages . . . can be computed on a classwide basis."

Plaintiffs argued with respect to their contract causes of action that Specialists signed form contracts and that Apple's common "plan to destroy the Specialists" targeted the entire class and deprived them of the benefits of their contracts. They asserted that "[w]hether Apple unfairly favored its own stores in allocating new product" was "one of the many factual issues shared by the class."

Plaintiffs argued with respect to their fraud cause of action that the element of reliance was no impediment to class treatment because reliance would be presumed "in light of the uniformity and materiality of Apple's omissions and representations to the class." They claimed that whether Apple gave certain stores a pricing advantage over Specialists in violation of the UPA could also be established by proof common to the class.

Six of the seven plaintiffs submitted declarations in support of the motion. Several of their lawyers, their litigation consultant Thomas Santos (a former Apple authorized

6

reseller who was pursuing an individual lawsuit against Apple), and their damages expert D. Paul Regan also provided declarations.

Apple opposed the motion, arguing among other things that class certification could not be based on an alleged "scheme" to drive Specialists out of business because there was no substantial evidence that any such scheme ever existed. Apple pointed out that plaintiffs' reliance on an analysis that a consulting firm prepared before the decision was made to move forward with the retail stores project did not evidence Apple's state of mind and did not in any event establish a plan to put the resellers out of business. It submitted evidence controverting plaintiffs' contention that its plan was to "cannibalize" its resellers' sales, noting that any such plan would have doomed the project. "This is common sense," Apple argued. "[I]t would make no sense for Apple to incur the expense of opening retail stores in locations like 5th Avenue in New York or Michigan Avenue in Chicago just to sell to the same customers who otherwise would have bought from the Specialists."

Apple declared unequivocally that no scheme to put Specialists out of business ever existed. It submitted business plans reflecting its continuing commitment to support its resellers in general and Specialists in particular.

Apple also presented evidence that Specialists as a group have succeeded since 2001, as shown by the substantial growth of the company's sales to the group since the Apple stores opened. Many individual Specialists saw their sales of Apple products double or triple or more since 2001. Twelve of those Specialists submitted declarations describing their businesses' remarkable success since 2001, which many attributed in part to the increase in brand awareness that resulted from the opening of the Apple stores. Apple's expert economist Michael Keeley, Ph.D. explained that Apple had no incentive to undermine Specialists or other resellers. Nor did it have any incentive to invest billions to launch retail stores that would do no more than make sales that Specialists and other resellers would have made anyway. It is a "common misconception" that

7

manufacturers earn more profit by taking over retailing from their independent resellers. In fact, the opposite is true. Multiple retail channels allow Apple to serve a broader range of customers than it could serve through a single channel like the Apple stores. Keeley pointed out that Apple did not need to resort to the actions that plaintiffs alleged. If a Specialist were damaging Apple's brand image, Apple could end its relationship with that Specialist simply by terminating its contractual relationship. It would not be in Apple's interest to resort to the actions that plaintiffs alleged because those actions would harm its customers and its reputation.

Apple urged as a second basis for denying plaintiffs' motion that individual rather than class issues would predominate. It addressed plaintiffs' deception-based claims first, arguing that courts have certified fraud claims for class treatment "only in exceedingly rare cases where there was clear evidence that defendants made identical representations to each class member," which was not the case here. Apple emphasized the absence of evidence that any Specialist received any of the internal Apple documents that plaintiffs mischaracterized and purported to rely on. It noted plaintiffs' failure to identify any uniform oral misrepresentations. It submitted evidence showing wide variation in what (if anything) various Specialists claimed they were told and how they interpreted those statements.

Apple argued that individual issues would also predominate with respect to reliance on the alleged fraud. It maintained that plaintiffs Siechert & Synn and Weingarten could not prove reliance because statements that Tom Siechert and Weingarten made and broadcasted to their fellow Specialists as early as 2001 established that neither had believed the alleged misrepresentations. It pointed to Seichert's deposition testimony that he was "sure" there were other Specialists who also disbelieved "what we were being told."

Apple also submitted evidence that Rogers and Omnitech's Frank O'Neil both admitted that they would have become Specialists whether or not Apple promised them

8

"priority allocation." Both continued to sign Specialist contracts even after they assertedly concluded that Apple lied to them about its retail stores. Apple produced evidence that other named plaintiffs and many other Specialists continued to sign Specialist agreements after January 2004, when plaintiffs claimed the company's "true intention" to put them out of business was revealed.

Apple argued that plaintiffs' fraud claim also raised "inherently individualized" statute of limitations issues. The complaint was filed on February 17, 2005. In 2008, the trial court ruled that the fraud claims were barred by the three-year statute of limitations (Code Civ. Proc., § 338, subd. (d)) unless plaintiffs could establish delayed discovery. Apple argued that the 2008 ruling applied to all proposed class members, who would have to prove when and how they discovered the alleged fraud and establish that they could not have discovered it earlier.

Apple argued that plaintiffs' good faith and fair dealing cause of action also raised predominately individual issues. Plaintiffs asserted that their Specialist contracts promised them " 'priority product allocation' " and that Apple's alleged scheme to " 'starve' " them of new products deprived them of the benefit of those Specialist contracts. Apple presented evidence that the agreement that every reseller signs has always given Apple the right to allocate inventory on a basis that it in its sole discretion deems equitable. It noted that "priority product allocation" was not defined in any of the documents that plaintiffs relied on. It submitted evidence that each named plaintiff interpreted those words quite differently. Apple argued that in these circumstances, determining the meaning of the phrase would require the court to consider extrinsic evidence of what each Specialist was told and what documents each received. Even if plaintiffs had evidence that there was a scheme to starve them of new products, "each class member still would have to prove that it was impacted" by the scheme. To support its claim that this could not be done by class proof, Apple submitted evidence showing

that "constrained"[3] product was allocated to Specialists on an individual basis, with various considerations affecting how much a particular Specialist received. For example, only some Specialists participate in a program that allows them to receive certain products prior to release. Specialists in higher tiers of the program can be provided with product before Apple supplies those in the lower tiers. And not all Specialists are affected by every product shortage because not all of them order every constrained product. Specialists that target businesses, for example, typically focus on computers, not iPods.

Apple argued that plaintiffs' own experiences confirmed that individual issues would predominate with respect to their good faith and fair dealing claim. It produced evidence that Omnitech and Weingarten had access to constrained product at the same time as the closest Apple retail stores, which were 40 to 70 miles away, and that it shipped constrained product to Omnitech and Weingarten even before it filled all of the nearby retail stores' orders. It also presented evidence that Specialists experienced delays in receiving product for reasons that had nothing to do with Apple's allocation decisions. A former Omnitech employee testified that Omnitech experienced delays because of its credit problems. Other Specialists ordered their products from third-party distributors, who made their own allocation decisions. Thus, Apple argued, resolving allocation-related claims would require inquiry into facts unique to each Specialist and unique to each order. These would include when the order was placed, what quantity was ordered, whether it was ordered from Apple or from an independent distributor, when it was received, whether the Specialist had the cash or credit to pay for the product, whether any delay was caused by circumstances that had nothing to do with the alleged scheme, whether any Apple retail stores in the Specialist's market had access to the product when

---

[3] A product is "constrained" when the orders for that product exceed Apple's available inventory. During times of product constraint, every channel (including Apple's retail store channel) wants more of the constrained product than it receives.

10

the Specialist did not, and whether the Specialist would have been able to sell more product had it received more. Apple maintained that these individual issues would "overwhelm" any common issues.

Apple next addressed plaintiffs' secret rebates claim, asserting that it was unaware of "a single case certifying this kind of claim for class treatment." Apple argued that such claims are not amenable to class treatment because each plaintiff must prove competitive injury. Specialists who were not located near any of the resellers that Apple allegedly favored or who did not compete with those resellers for some other reason could not prove competitive injury. Those who did compete with an allegedly favored reseller would have to prove that the rebates given to the reseller, and not any other factors, caused the Specialist to lose sales or profits. That inquiry would involve facts unique to each member of the proposed class.

Apple next addressed injury, causation, and damages issues, arguing that these were inherently individualized inquiries that would overwhelm any common questions. It pointed to expert economist Keeley's report, which identified the many company-specific factors that would affect any analysis of whether Apple's alleged conduct harmed a particular Specialist and the extent of any such harm. Apple argued that plaintiffs' testimony and the 12 declarations from non-plaintiff Specialists whose businesses have enjoyed tremendous success illustrated that each individual Specialist's profitability is determined by a myriad of factors. Apple argued that plaintiffs could not "finesse" this issue with their expert Regan's opinion that "it is possible to calculate the economic damages suffered by the Apple Specialist Resellers on a class-wide basis." Apple emphasized that Regan described his opinion as a hypothetical damages model that was not based on actual data. Regan admitted that he had not finalized or tested the model. Regan also admitted that he could not offer any opinions on whether any of the named plaintiffs suffered economic damages. Apple dismissed Regan's opinion as irrelevant. It noted that California limits recovery for injury to a business to lost *net*

11

profits. Regan admitted that his hypothetical model would calculate only lost gross profits.

The trial court took the matter under submission after a lengthy hearing at which both sides utilized slide presentations. The court issued a written order denying the motion. The court found that plaintiffs "did not meet their burden of showing that common questions of law or fact would predominate over the questions affecting individual members." The court specifically found that "[w]ith regard to the fraud-based claims . . . , each class member will need to prove delayed discovery in order to get past Apple's statute of limitations defense. This is an inherently individualized inquiry."

"Further, each member will need to present highly individualized evidence regarding the representations he or she heard, his or her reliance upon the representations, whether the damages suffered were proximately caused by the fraud (as opposed to other unique factors such as their market, location, state of the local economy, level of service at the store, and management expertise), and the amount of damages."

"With regard to contract-based claims . . . , individual issues will also predominate. The evidence shows that each of the Plaintiffs has a highly individual claim with regard to allocation. The same would be expected of each member of the Specialist Class. In other words, there is no commonality with regard to which products were wrongfully withheld from members of the Specialist Class. Further, there are also substantial variations in the confirmation letters that Apple provided to members of the Specialist Class during the Class Period. Each member of the Specialist Class would have to present highly individualized evidence regarding which products were withheld or delayed, when those products were ordered, when they were received, whether Apple retail stores and/or Apple Online was treated more favorably as to allocation of those products, whether the member's own conduct (such as credit problems or conditions attached to an order) caused the withholding or delay, whether the withholding or delay of those products proximately caused damage, and the amount of damage."

"With regard to the misappropriation of trade secrets claims . . . , individual issues would predominate as to the existence of a trade secret, the use or misappropriation of the trade secret, proximate causation, and amount of damages." "With regard to the secret rebates claims . . . , individual issues would predominate as to whether each class member suffered a 'competitive injury.'"

As a second basis for its denial of class certification, the court found that "all of the factors point to individual lawsuits being superior to a class action." Plaintiffs filed a timely notice of appeal from the trial court's order.

## II. Discussion

Plaintiffs challenge the denial of their motion. They contend that the trial court "incorrectly applied class certification standards, used improper criteria and made erroneous legal assumptions and unsupported, irrelevant factual findings." We disagree.

"'The certification question is "essentially a procedural one that does not ask whether an action is legally or factually meritorious."'" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1023 (*Brinker*).) "Presented with a class certification motion, a trial court must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate. To the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them." (*Brinker*, at p. 1025.)

"As the focus in a certification dispute is on what type of questions—common or individual—are likely to arise in the action, rather than on the merits of the case [citations], in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment. [Citations.] 'Reviewing courts consistently look to the allegations of the

13

complaint and the declarations of attorneys representing the plaintiff class to resolve this question.'" (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327.) "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."'" (*Brinker*, *supra*, 53 Cal.4th at p. 1021.)

"The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' . . . A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. [Fn. omitted] 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'" (*Brinker*, *supra*, 53 Cal.4th at pp. 1021-1022.) "[The court] must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence." (*Brinker*, at p. 1024.)

## A. Standard of Review

"'The decision [whether] to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the

14

efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .'" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)

"The appeal of an order denying class certification presents an exception to the general rule that a reviewing court will look to the trial court's result, not its rationale. If the trial court failed to follow the correct legal analysis when deciding whether to certify a class action, 'an appellate court is required to reverse an order denying class certification . . . , "even though there may be substantial evidence to support the court's order." ' [Citations.] In other words, we review only the reasons given by the trial court for denial of class certification, and ignore any other grounds that might support denial." (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828-829.)

### B. Predominance—Fraud Claim

Plaintiffs contend that the trial court erred in concluding that they failed to establish the predominance of common questions with respect to their fraud claim. We disagree.

### 1. Fraud Claim—Statute of Limitations

Plaintiffs challenge the trial court's finding that Apple's statute of limitations defense to their fraud claim would require an inherently individualized inquiry since "each class member will need to prove delayed discovery in order to get past" that defense. They claim the court was "legally wrong to believe that it could deny

15

certification based on individual statutes of limitations issues" and that it "also erred in concluding that individual issues arose . . . ." We deem these arguments forfeited by plaintiffs' failure to raise them below in response to Apple's contention that their fraud claim raised individualized statute of limitations and delayed discovery issues. (*Fairbanks v. Farmers New World Life Ins. Co.* (2011) 197 Cal.App.4th 544, 552.)

We would reject these arguments even if we assumed that plaintiffs preserved them. In examining whether common issues of law or fact predominate, "[t]he affirmative defenses of the defendant must also be considered, because a defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that the issues presented by that defense predominate over common issues. [Citations.]" (*Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450.) The trial court did not err in considering whether Apple's statute of limitations defense would raise predominately individual issues. (*Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 811.)

The trial court's finding that Apple's statute of limitations defense to plaintiffs' fraud claim would require an inherently individualized inquiry was supported by substantial evidence. To establish delayed discovery, class members will need to prove when and how they discovered the alleged fraud and why they could not have discovered it sooner. (*McKelvey v. Boeing North American, Inc*. (1999) 74 Cal.App.4th 151, 160.) This cannot be done with common evidence because there was substantial evidence that each of the named plaintiffs has a different story. Apple submitted evidence that Siechert complained to the Federal Trade Commission in May 2001, accusing Apple of fraud and asserting that it was trying to eliminate its resellers. He began disseminating those views via the "SpeciaList" listserve in May 2001, cautioning his fellow Specialists not to believe what Apple was telling them about the retail stores. Siechert eventually dismissed his fraud cause of action.

16

Plaintiff Weingarten began broadcasting views similar to Siechert's on the listserve in 2001, warning other Specialists that Apple "will continue the stores and try and put every one of you out of business." Notwithstanding this and similar 2001 e-mails, the complaint alleges (and Weingarten declared) that he did not discover Apple's "true intentions" to drive the resellers out of business until January 1, 2004, when Apple executives "failed to communicate again with" him about issues he raised in a 2003 e-mail and later discussed with them. Plaintiffs Rogers, Mel Weisblatt of Computer Outlet, and O'Neil claimed that they discovered Apple's "true intentions" at different times and in varying ways in the latter part of 2003 and early 2004.

The e-mails that Siechert and Weingarten broadcasted to the listserve in 2001, Weingarten's declaration, and Siechert's dismissal of his fraud cause of action supported a conclusion that when and how each member of the proposed class discovered the alleged fraud and why he or she could not have done so earlier cannot be proven by common evidence. Substantial evidence thus supported the trial court's finding that Apple's statute of limitations defense to plaintiffs' fraud claim would require an individualized inquiry.

Plaintiffs criticize the court's "unexplained conclusion" that their UCL claim also raised individual statute of limitations issues. They base their argument on the following paragraph from the court's order denying certification: "In this case, Plaintiffs did not meet their burden of showing that common questions of law or fact would predominate over the questions affecting individual members. With regard to the fraud-based claims (9th *and 11th* causes of action), each class member will need to prove delayed discovery in order to get past Apple's statute of limitations defense. [Italics added.] This is an inherently individualized inquiry. A defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that the issues presented by that defense predominate over common issues. [Citation.] Further, each member will need to present highly individualized evidence regarding the

17

representations he or she heard, his or her reliance upon the representations, whether the damages suffered were proximately caused by the fraud (as opposed to other unique factors such as their market, location, state of the local economy, level of service at the store, and management expertise), and the amount of damages."

In the context of this case, we think the reference to plaintiffs' ninth cause of action (for violation of the UCL) was a mistake. Plaintiffs' motion papers confusingly referred to "the class's deception-based claims—their claims of fraudulent business practices under the UCL and common-law fraud." But their eighth amended complaint does not assert a claim for fraudulent business practices. Their ninth cause of action for *unlawful* business practices in violation of the UCL is based on allegations that Apple sold its resellers used and/or refurbished products as new. It says nothing about a scheme to drive the resellers out of business. To the extent that plaintiffs have a claim for fraudulent business practices under the UCL based on allegations that Apple engaged in any such scheme, that claim is unpleaded.

Apple did not argue in opposition to class certification that plaintiffs' UCL claim was time-barred. It argued that their fraud claim raised "fundamental individual issues regarding the statute of limitations." The trial court had in 2008 ruled that the fraud claim was time-barred unless plaintiffs could establish delayed discovery. The 2008 order said nothing about the UCL claim. Against this background, we conclude that the trial court's mention of plaintiffs' ninth cause of action was a mistake rather than a "conclusion" that the UCL claim raised individual statute of limitations issues.

### 2. Fraud Claim—Reliance

Plaintiffs challenge the trial court's finding that "each member will need to present highly individualized evidence regarding the representations he or she heard [and] his or her reliance upon the representations." They assert that individual issues will not arise because "reliance is presumed or inferred upon a showing that the information misstated or concealed was material to a reasonable person." We disagree.

18

The cases plaintiffs rely on to support their argument are inapposite. *In re Tobacco II Cases* (2009) 46 Cal.4th 298 (*Tobacco II*) and *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282 (*Massachusetts Mutual*) are UCL fraudulent business practices cases. "'[T]he "fraud" contemplated by section 17200 [ ] . . . bears little resemblance to common law fraud or deception.'" (*Massachusetts Mutual*, at p. 1290.) "The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud." (*Tobacco II*, at p. 312.) Neither of the cases that plaintiffs cite supports a presumption of reliance in common law fraud cases like this one.

Plaintiffs next argue that "classwide reliance will be presumed or inferred because Apple's misrepresentations were uniform, and were written or scripted." They raised a similar argument below. The trial court properly rejected it.

Reliance is a necessary element of a claim for fraud. *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 (*Alliance*).) "California courts have always required plaintiffs in actions for deceit to plead and prove the common law element of actual reliance." (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1092 (*Mirkin*).) Actual reliance must also be pleaded and proved in cases averring fraud by omission. (*Id.* at pp. 1092-1093.) In rare situations, "*when the same material misrepresentations have actually been communicated to each member of a class*, an inference of reliance arises as to the entire class." (*Id.* at p. 1095, citing *Vasquez v. Superior Court* (1971) 4 Cal.3d 800 (*Vasquez*) and *Occidental Land, Inc. v. Superior Court* (1976) 18 Cal.3d 355 (*Occidental Land*).)

Plaintiffs' reliance on *Vasquez* and *Occidental Land* is misplaced. Reliance was a common issue in *Vasquez* but only under what the *Mirkin* court called "the peculiar facts of the case." (*Mirkin*, *supra*, 5 Cal.4th at p. 1094.) The plaintiffs in *Vasquez* bought frozen meat and freezers on installment contracts. (*Vasquez*, *supra*, 4 Cal.3d at p. 805.) They sued the sellers for fraudulently misrepresenting the price and value of the

19

merchandise. The trial court sustained demurrers to the class action aspect of the fraud count. (*Id.* at pp. 805-806.) The high court granted the plaintiffs' writ petition, explaining that the plaintiffs claimed they could demonstrate on a classwide basis that the alleged representations were in fact made to each class member. They could do so "because the salesmen employed by [the defendant] memorized a standard statement containing the representations (which in turn were based on a printed narrative and sales manual) and . . . this statement was recited by rote to every member of the class." (*Id.* at pp. 811-812.) "The demurrers must be deemed to admit these facts. If plaintiffs can prove their allegations at the trial, an inference that the representations were made to each class member would arise, in which case it would be unnecessary to elicit the testimony of each plaintiff as to whether the representations were in fact made to him." (*Id.* at p. 812, fn. omitted.) If the trial court found the misrepresentations were material, "at least an inference of reliance would arise as to the entire class." (*Id*. at p. 814.)

*Occidental Land* presented a similar situation. The plaintiff homebuyers in that case alleged that the defendant developer misrepresented the future cost of maintaining certain common areas. Relying on *Vasquez*, the court held that actual reliance was susceptible of common proof because the alleged misrepresentations were contained in a public report and "[e]ach purchaser was obligated to read the report and state in writing that he had done so." (*Occidental Land*, *supra*, 18 Cal.3d at pp. 358, 361.)

This case is different. Unlike in *Vasquez* or *Occidental Land*, there was no evidence here that the alleged "series of false representations" was "in fact made" to each class member. (*Vasquez*, *supra*, 4 Cal.3d at pp. 811-812.) There was no evidence that each class member expressly acknowledged reading or hearing the identical series of false misrepresentations. (*Occidental Land*, *supra*, 18 Cal.3d at pp. 358.) The *Vasquez*/*Occidental Land* inference of reliance does not apply without uniform material misrepresentations having been actually made to class members. (E.g., *Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 846-847 (*Kaldenbach*).)

20

Plaintiffs argue that classwide reliance should be presumed or inferred because the "representation that Specialists would receive 'priority' allocation was in writing in *every* Specialist's written contract." Not so. The Specialist confirmation letters described some of the benefits and requirements of the Specialist program. Those benefits and requirements varied over time. The confirmation letters also varied over time, as plaintiff O'Neil acknowledged. There was no uniform representation about "'priority' allocation." Classwide reliance is not properly inferred in circumstances like these, as the trial court properly concluded. (*Kaldenbach*, *supra*, 178 Cal.App.4th at pp. 846-847.)

Any inference of reliance here would be particularly inappropriate because there was affirmative evidence that the allegedly "scripted" misrepresentations were not communicated to all Specialists or even to all of the named plaintiffs. Plaintiff Weisblatt asserted in a declaration that Apple representatives told him there would be "a 'level playing field'" between the Apple stores and resellers' stores. But he admitted in deposition that he did not recall any conversations in which Apple representatives used that term to reassure him about how the retail stores would operate in relation to Specialists like him. He testified that Apple representatives stated at gatherings of resellers that the company was going to give Specialists "a fair shake" or words to that effect, that the retail stores were going to expand business "for the whole Apple corporation and that we would get a large part of that," and that "the dealers were important and they would be taken care of basically."

Plaintiff O'Neil could not recall being told that "'all ships will rise with the tide'" and he equivocated when asked whether Apple representatives told him that the Apple stores would be on "'a level playing field'" with resellers' stores. Other Specialists declared that they were "never" told that all ships would rise with the tide, that the retail stores would be on a level playing field with the Specialists' stores, or that they or any Specialist would receive product before the retail stores or before any other Apple reseller. Substantial evidence thus supported the trial court's finding that each class

21

member would need to present highly individualized evidence regarding the particular representations that he or she claimed to have heard.

Substantial evidence also supported the trial court's finding that each class member would need to present individualized evidence about how he or she relied on the alleged misrepresentations. There was evidence that not all Specialists heard the alleged misrepresentations. A person obviously cannot establish actual reliance on a misrepresentation that he or she never heard. (*Mirkin*, *supra*, 5 Cal.4th at pp. 1089, 1100.)

Nor can a person claim to have been deceived by a misrepresentation that he or she did not believe. (*Maxon-Nowlin Co. v. Norswing* (1913) 166 Cal. 509, 511-512.) There was evidence that not all Specialists believed the misrepresentations they claim to have heard. Weingarten's 2001 posts to the listserve warned of "Apple's long range plan" to "do away with all you resellers." O'Neil testified based on his recollection of other Specialists' postings to the listserve that at least some of them did not believe that the retail stores would increase Specialists' sales. Siechert testified that he was "sure" there were "other folks that didn't believe what we were being told."

Apple presented evidence that called some Specialists' claimed reliance on the alleged misrepresentations into question. "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction. [Citation.]" (*Alliance*, *supra*, 10 Cal.4th at p. 1239.) Rogers testified that she "[p]robably" would have become a Specialist with or without a promise of priority product allocation. Rogers continued to sign reseller and Specialist contracts for years after she claimed to have discovered Apple's alleged scheme to put her out of business. O'Neil did the same. All of this evidence amply supported the trial court's finding that reliance was not susceptible of classwide proof. Instead, each class member would need

to present "highly individualized evidence" about which representations he or she heard and how (if at all) he or she relied on them.

### 3. Fraud Claim—Causation and Damages

Plaintiffs challenge the trial court's finding that their fraud claim would require each member of the class to provide "highly individualized evidence regarding . . . whether the damages suffered were proximately caused by the fraud (as opposed to other unique factors such as their market, location, state of the local economy, level of service at the store, and management expertise) and the amount of damages." To the extent they contend that the court should not have considered whether causation and damages raised predominately individual issues, we reject the contention.

"'[R]esulting damage'" is a necessary element of fraud. (*Alliance*, *supra*, 10 Cal.4th at p. 1239.) "Deception without resulting loss is not actionable fraud. [Citation.] 'Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the representations must be shown.' [Citation.]" (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818.) Thus, the trial court did not err in considering whether proximate cause and damages could be proven on a classwide basis. (*Brinker*, *supra*, 53 Cal.4th at p. 1023.)

Plaintiffs maintain that the trial court "disregarded how such class damages are tried and assumed that they would be proven on a strictly individual basis, which is contrary to law." Their reliance on *In re Cipro Cases I & II* (2004) 121 Cal.App.4th 402 (*Cipro*) is misplaced. In *Cipro*, the court affirmed an order certifying a Cartwright Act price-fixing case as a consumer class action. It did so after determining (among other things) that substantial evidence supported the trial court's finding that damages were susceptible of classwide proof by expert testimony without regard to the particular circumstances of each individual class member. (*Id.* at pp. 411.) The *Cipro* court did not hold or suggest that the calculation of aggregate classwide damages is appropriately based on a formula in all or most cases. Nor did the *Cipro* court suggest that it is an

23

abuse of discretion for a trial court to deny certification when it concludes that determining the fact and extent of class members' damages would require individualized inquiries that would preclude a finding that common issues predominate. The court expressly recognized that "[i]t is within the trial court's discretion to weigh the inherent imperfections of such approximations against the vindication of important statutory policies and the burden to the courts of proving damages on a strictly individual basis." (*Cipro*, at p. 418.)

The important statutory policies implicated in *Cipro* address anticompetitive conduct. As the court noted, "claims of anticompetitive collusion resulting in higher market prices are particularly suited for class treatment." (*Cipro*, *supra*, 121 Cal.App.4th at p. 415.) "[I]t has long been recognized [in the antitrust context] that, although the fact of injury must be established with reasonable certainty, a less rigid standard of proof is imposed with respect to the amount of damage caused by an antitrust violation, because economic harm in such actions is difficult to quantify." (*Evans v. Lasco Bathware, Inc.* (2009) 178 Cal.App.4th 1417, 1431 (*Evans*).) In such cases, "rather than deny any recovery to those injured by anticompetitive activity because they cannot prove damages with exactitude, 'it will be enough if the evidence show [*sic*] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.' [Citation.]" (*Evans*, at p. 1431, quoting *Story Parchment Co. v. Paterson Parchment Paper Co.* (1931) 282 U.S. 555, 563.)

Here, no such difficulties of proof exist. This is not an antitrust case. *Cipro* does not advance plaintiffs' position.

Plaintiffs assert that individual issues of causation "[d]o [n]ot [p]redominate." We disagree. Substantial evidence supported the trial court's finding that plaintiffs' fraud claim raised predominately individual issues of causation and damages. Plaintiffs' theory of recovery was that the alleged fraudulent misrepresentations caused them to suffer "substantial loss of customers, business and sales over time, substantially diminishing the

24

value of their businesses." Their claim is one for lost profits, the fact and extent of which must be shown "'with reasonable certainty.'" (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 907-908.) Plaintiffs cannot recover profits lost for reasons unrelated to Apple's alleged wrongdoing. (*Continental Car-Na-Var Corp. v. Moseley* (1944) 24 Cal.2d 104, 113.)

Apple's expert economist Keeley identified numerous firm-specific factors unrelated to Apple's alleged wrongdoing that can affect an individual Specialist's performance. These included the number of storefronts, their location, their target customers, product mix and service offerings, their reliance on Apple products, their inventory practices, and the extent of competition from other resellers and other computer retailers. We have already described the many differences among the Specialists with respect to those factors. (*Ante*, at pp. 2-3.) As Keeley explained, it can be inferred from these differences that any effect of Apple's alleged conduct would vary from Specialist to Specialist.

The record illustrates the point. There was evidence that some Specialists who claimed to have heard and relied on the alleged misrepresentations faltered for reasons that had nothing to do with Apple's alleged wrongdoing. Plaintiff Omnitech, for example, was located in a poor location in a fairly remote part of Hyannis, Massachusetts with virtually no pedestrian traffic. A former Omnitech employee testified that the company's retail showroom was "old, cluttered, poorly maintained, and unattractive." Omnitech suffered from poor management and often did not have high-demand products in stock because of its credit problems. Its service center was understaffed. Former owner O'Neil admitted that a competing Specialist "was an increasing drain on our business." It was "a major blow" to Omnitech when that Specialist opened its second store in the nearby town of Harwich, Massachusetts. When Omnitech went out of business in April 2007, the same competitor opened another store in Hyannis. The competitor's Hyannis store has succeeded.

25

There was evidence that plaintiff Weisblatt's Computer Outlet also faltered for reasons unrelated to Apple's alleged wrongdoing. Weisblatt testified that Computer Outlet stopped being profitable in 1996. Weisblatt had an expensive long-term lease on a building with two large training rooms where customers could learn how to use computers. But training became increasingly less important as the general public became more knowledgeable about computers. In addition, Computer Outlet lost many large business customers when their companies were acquired by companies that had existing purchasing relationships with other computer retailers.

Apple submitted evidence that many Specialists enjoyed remarkable success after the retail stores opened in 2001. Some attributed much of their success to the "'halo effect'" of the Apple stores. Others attributed their success to their own initiative. One Specialist "more than doubled" its growth by moving to a higher traffic location and investing in a top-quality build-out. Another Specialist located just blocks away from an Apple store diversified his business and differentiated it from the competition through its customer service policies. Its revenues have grown steadily since it became a Specialist in 2002. This and similar evidence showed that individual Specialists succeeded or faltered for reasons unique to their individual businesses. Substantial evidence thus supported the trial court's finding that plaintiffs' fraud claim raised predominately individual issues of causation and damages.

Plaintiffs maintain that the trial court's finding was "reversible error." They assert that the court improperly "ignored" their expert Regan's testimony that damages can be calculated on a classwide basis. The contention lacks merit. There is no evidence that the trial court "ignored" Regan's testimony. The hearing transcript reveals that the court read Regan's submissions but was not convinced by his theories. We do not find this surprising. Regan's declaration was entirely speculative. He declared that it was "possible" to calculate the economic damage suffered by the Specialists on a classwide basis. But he conceded in deposition that the only work he had done was "hypothetical"

26

and "not based upon actual data from Apple." He had not performed any calculations or tried to validate whether any of the theories that he and plaintiffs' counsel discussed "might actually work." He had not constructed any model. Nor had he done anything to validate his hypothetical model. Regan acknowledged that he had not examined any evidence specific to any of the named plaintiffs, did not know anything about any of them, and could not offer any opinions on whether any of them suffered any economic damages. Moreover, Regan conceded that even if he could develop an aggregate damages model, whether any specific Specialist had been injured by Apple's alleged wrongful conduct could only be determined by a Specialist-specific analysis. Regan's testimony did not constitute substantial evidence that damages could be calculated on a classwide basis. (See *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1111 [reversing trial court's predominance finding because expert testimony was "too qualified, tentative and conclusionary to constitute substantial evidence" that causation and damages could be proved by common evidence].) As plaintiffs' counsel admitted, "the damage theories, exactly how we will present them, you know, we have Regan's declaration. We don't have more than that."

Even if Regan's testimony was substantial evidence that damages could be calculated on a classwide basis, it is not our task to second-guess the trial court's conclusions. "Our role on this appeal is narrowly confined to examining whether the trial court's ruling is supported by substantial evidence, and if it is, we may not substitute our own judgment for that of the trial court." (*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 992 (*Dailey*).) We must "confine our analysis to whether the record contains substantial evidence supporting the trial court's conclusion" that plaintiffs' fraud claim raised predominately individual issues of causation and damages. (*Ibid.*)

### C. Predominance—Contract-Based Claims

Plaintiffs challenge the trial court's refusal to certify their claim that Apple's alleged scheme to put them out of business by starving them of new products denied them the benefit of their agreements with the company. They complain that the court's findings were unsupported by the evidence. We disagree.

The trial court found that each named plaintiff had "a highly individual claim with regard to allocation" and that "[t]he same would be expected of each member of the Specialist Class. In other words, there is no commonality with regard to which products were wrongfully withheld from members of the Specialist Class." The court also found "substantial variations in the confirmation letters that Apple provided to members of the Specialist Class during the Class Period." It concluded that each member of the class "would have to present highly individualized evidence regarding which products were withheld or delayed, when those products were ordered, when they were received, whether Apple retail stores and/or Apple Online was treated more favorably as to allocation of those products, whether the member's own conduct (such as credit problems or conditions attached to an order) caused the withholding or delay, whether the withholding or delay of those products proximately caused damage, and the amount of damage." Ample evidence supported these findings.[4]

There was evidence that Apple allocated constrained product among its worldwide segments, among the different channels in those regions, and among distributors or resellers in each channel on an ad hoc basis rather than by a set policy or formula. Many different factors affected when a Specialist received a particular constrained product and how much he or she received. For example, those in higher tiers of the Specialist

---

[4]     We reject plaintiffs' assertion that the trial court failed to consider the evidence that they submitted. The court's questions at the hearing illustrate its thorough familiarity with the evidence and the issues. Before the court took the matter under submission, it sought copies of the slide presentations that both sides used to highlight their arguments.

program were entitled to receive more of a constrained product than those in the lower tiers. Those who participated in the early order/early ship program for new products could receive shipments ahead of those who did not participate in that program. Whether a Specialist ordered product directly from Apple or from an independent distributor also made a difference because the distributors made their own allocation decisions without any input from Apple. Moreover, not all Specialists ordered every constrained product.

The evidence convincingly showed that the named plaintiffs' claims were highly individual. Their claims of wrongfully withheld products varied substantially. Weingarten claimed that Apple deliberately withheld nine different product models from him. Horizon contended that Apple wrongfully withheld 29. Omnitech maintained that 137 products were wrongfully withheld. Siechert limited some of his claims to particular orders. He placed six different orders for the same product model between December 2001 and March 2002 but claimed that only the third was wrongfully withheld. None of the other named plaintiffs contended that that particular product was wrongfully withheld.

There was evidence that Apple's first shipments of constrained product to Specialists in a particular area were often made before or on the same date as its first shipments to Apple retail stores in the vicinity. There was evidence that on numerous occasions, Apple shipped product to the named plaintiffs instead of to nearby Apple retail stores. All of this evidence showed that plaintiffs' claims of wrongful allocation would require a Specialist-by-Specialist and product-by-product inquiry. Thus, substantial evidence supported the trial court's finding that plaintiffs' allocation claims could not be established on a classwide basis.

Plaintiffs argue that the trial court's "attempt to extrapolate" its findings about their claims to those of the absent class members was "baffling." We disagree. Plaintiffs purported to represent a class of "similarly situated" Apple resellers. Substantial evidence supported the trial court's conclusion that plaintiffs' allocation claims would

require a highly individualized inquiry. It was reasonable for the court to conclude that the claims of purportedly "similarly situated" class members' would likewise require a highly individualized inquiry.

Plaintiffs argue that the trial court's "attempt to extrapolate" its findings about their claims to those of the absent class members was also "unnecessary." We disagree. The essence of plaintiffs' argument is that substantial evidence supported their position. The argument misperceives our role on appeal, which is "narrowly confined to examining whether the trial court's ruling is supported by substantial evidence." (*Dailey*, *supra*, 214 Cal.App.4th at p. 992.) We have concluded that it was.

Plaintiffs argue that the trial court's conclusion that their allocation claims could not be established on a classwide basis but would instead require a highly individualized inquiry was "simply wrong, as a matter of law." We disagree. Plaintiffs' reliance on *Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676 (*Capitol People*) and similar cases is misplaced. The plaintiffs in *Capitol People* challenged a "systemic failure" by state agencies to provide community services to persons with developmental disabilities. (*Capitol People*, at pp. 691, 702.) They alleged that the defendants' failure to provide the statutorily-mandated level of services deprived class members of their rights. (*Ibid.*) The trial court concluded that the plaintiffs could not satisfy the commonality requirement because the issues dictated inquiry into each class member's individualized circumstances. (*Id*. at p. 688.) The Court of Appeal reversed, repeatedly emphasizing that the plaintiffs sought "only systemic relief, and not individual solutions to individual problems." (*Id*. at pp. 681, 686, 690, 693, 695, 702-703.) That "'systemic relief'" (specifically, an order compelling the agencies to put in place procedures, practices, and an infrastructure to ensure their ability to satisfy their obligations to class members) "'could not be obtained on a case-by-case basis.'" (*Id*. at p. 694.)

30

This case is nothing like *Capitol People.* It has nothing to do with entitlement to government benefits on a systemic basis. Nor can the alleged harm in this case be remedied by a single injunction. Unlike in *Capitol People*, plaintiffs here seek "severe monetary damages" for each and every class member in the form of profits lost by his or her business. This requires an individualized inquiry, as the trial court properly found. *Capitol People* is inapposite.

Plaintiffs challenge the sufficiency of the evidence supporting the trial court's finding that the Specialist confirmation letters contained substantial variations. They assert that "[t]here were *no* such variations." They maintain that "*all* of the contracts during the Class Period promised priority allocation." We cannot agree.

There was evidence that the terms of the Specialists confirmation letters varied over time. Early letters described " 'advantageous product allocation' " as a benefit of the Specialist program but qualified that statement with the caveat that it was important to understand that advantageous product allocation did not mean that Apple would guarantee delivery. The 2001 confirmation letters described "Priority Product Allocation" as a benefit of the Specialist program. The 2003 confirmation letter said "Priority Launch Allocation—Apple reserves the right to allocate more product to Apple Specialists in each correspondingly higher program tier." None of the letters defined "Priority Product Allocation" or "Priority Launch Allocation." The fact that the word "priority" happens to appear in otherwise different phrases does not make the meaning of those phrases "identical," as plaintiffs assert. Substantial evidence thus supported the trial court's finding that the Specialist contracts were not identical.

### D. Predominance—"Secret Rebates" Claim

Plaintiffs challenge the trial court's finding with respect to their UPA claim that "individual issues would predominate as to whether each class member suffered a 'competitive injury.' " Plaintiffs contend that this finding rested on "the same faulty

31

assumption" that they claim the court made "with respect to the fraud-based and contract-based claims—that each class member would have to prove its entitlement to relief individually." They assert that section 17082 excuses them from alleging or proving actual damages. We reject the contention.

Section 17045 provides that "[t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful." Competitive injury is a required element of any claim for violation of section 17045. (*Diesel Electric Sales & Service, Inc. v. Marco Marine San Diego, Inc.* (1993) 16 Cal.App.4th 202, 211-212 (*Diesel*); CACI 3320.) To prove competitive injury, a plaintiff must establish " 'with reasonable probability the existence of some causal connection between [the] defendant's wrongful act and some loss of anticipated revenue . . . .' " (*Diesel*, at p. 219.)

Section 17082 provides that "[i]n any action under this chapter, it is not necessary to allege or prove actual damages or the threat thereof, or actual injury or the threat thereof, to the plaintiff. But, in addition to injunctive relief, any plaintiff in any such action shall be entitled to recover three times the amount of the actual damages, if any, sustained by the plaintiff, as well as three times the actual damages, if any, sustained by any person who has assigned to the plaintiff his claim for damages resulting from a violation of this chapter." As explained in *Uneedus v. California Shoppers, Inc.* (1978) 86 Cal.App.3d 932, "[b]y section 17082's own terms, a plaintiff can bring an action for injunctive relief without proving actual damages. However, to be *entitled* to treble damages a plaintiff must prove actual damages. . . . In the absence of such proof, treble damages are not permitted *and a plaintiff is limited to an injunctive remedy*." (*Uneedus*, at p. 943, second italics added.)

Plaintiffs seek more than injunctive relief here.  They also seek actual and punitive damages.  They must plead and prove competitive injury.  (*Diesel*, *supra*, 16 Cal.App.4th at pp. 211-212.)

The next issue is whether substantial evidence supported the trial court's finding that competitive injury could not be established on a classwide basis.  It did.  Expert economist Keeley explained that whether a Specialist was adversely impacted by Apple's alleged discounting to favored resellers would depend on the extent to which that Specialist competed with the favored resellers' stores for sales.  There was evidence that Specialists located close to allegedly favored resellers were not necessarily in direct competition with them.  Omnitech, for example, was located near Best Buy and Staples but did not compete with them because they catered to the home user, while Omnitech's target market was small business.  Other resellers declared that nearby Best Buy or CompUSA stores had no appreciable impact on their sales.  In fact, there was evidence that one allegedly favored reseller referred its service and support business to a nearby Specialist store.  This evidence amply supported the trial court's conclusion that it would require an individualized inquiry to determine which Specialists were in direct competition with one or more allegedly favored resellers.  Those that were would have to prove that the alleged secret rebates (rather than other factors) caused them to lose sales or profits.  (See *American Booksellers Assn., Inc. v. Barnes & Noble, Inc.* (N.D.Cal. 2001) 135 F.Supp.2d 1031, 1043.)  As Keeley explained in his uncontroverted declaration, that could only be done on a Specialist-by-Specialist basis.  Substantial evidence thus supported the trial court's finding that plaintiffs' section 17045 claim raised predominately individualized issues.

Plaintiffs summarily assert that section 17045 "only requires injury to a *single competitor* to obtain classwide relief."  They cite no case to support the proposition.  Nor do they develop the argument.  We decline to consider it.  "'An appellate court is not required to examine undeveloped claims, nor to make arguments for parties.' [Citation.]"

33

(*American Corporate Security, Inc. v. Su* (2013) 220 Cal.App.4th 38, 44, fn. 3.) "When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary." (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700.) We deem the point abandoned.

### E. Superiority of Proceeding by Class Action

Plaintiffs challenge the trial court's finding that a class action would not be superior to individual lawsuits. We need not address this contention because " '[a]ny valid pertinent reason stated will be sufficient to uphold the [trial court's] order [granting or denying a class certification motion].' [Citation.]" (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 434-436.) We have already determined that the trial court properly denied plaintiffs' motion because individual issues predominated over class issues. (E.g., *Dailey*, *supra*, 214 Cal.App.4th at p. 1002, fn. 13 ["Given our conclusion here that Dailey failed to make the necessary showing of commonality as to his overtime pay and rest/meal break claims, it is not necessary for us to address the trial court's additional stated reasons for denying class certification, i.e., that a class action is not the superior method for resolving this dispute, and that Dailey is not a suitable class representative."].)

### III. Disposition

The order denying class certification is affirmed.

_____
Mihara, J.

WE CONCUR:


_____
Elia, Acting P. J.


_____
Grover, J.